IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

JACQUE FARNSWORTH,           )
                             )
                Plaintiff,   )      **CIVIL ACTION**
                             )
v.                           )      No.  08-1150-MLB
                             )
CITY OF MULVANE, KANSAS,     )
                             )
                Defendant.   )
_____    )


<u>**MEMORANDUM DECISION**</u>

**I.    INTRODUCTION**

This is a First Amendment case arising under 42 U.S.C. § 1983. Plaintiff Jacque Farnsworth alleges that as a result of defendant City of Mulvane, Kansas' ("Mulvane") policy, her rights to free speech, due process, and equal protection were violated when she was denied the opportunity to ask her question and escorted out of a city council meeting.

Mulvane is a municipality, part of which is located in Sumner County.  The citizens of Sumner County elected to have a state-approved casino constructed in Sumner County.  Mulvane was required to endorse a casino proposal as part of the construction process.  On January 16, 2008, Mulvane held a city council meeting that was open to the public for the purposes of listening to Sumner County Gaming Joint Venture, L.C.'s ("Harrah's") presentation, addressing the community's questions regarding the presentation, and listening to comments about the casino.  Mulvane established rules for the meeting, which were enforced by Mayor James Ford.

In the pretrial order (Doc. 19), Farnsworth sought nominal and

monetary damages for (1) the violation of her constitutional rights; (2) the embarrassment, humiliation, and loss of reputation due to the constitutional violation and being escorted out of the meeting by police[1]; and (3) attorneys' fees and costs under 42 U.S.C. § 1988. Farnsworth also seeks a declaratory judgment that Mulvane's policies and actions in this case were unconstitutional.

The case was tried to the court on September 1, 2009. This decision represents the findings of fact and conclusions of law resulting therefrom. Fed. R. Civ. P. 52(a). For the following reasons, the court declares that Farnsworth's right under the First Amendment was violated and finds that she is therefore entitled to an award of nominal damages, attorney's fees and costs but not compensatory damages.

## II.   FINDINGS OF FACT

The following findings are based on facts deemed established for trial and adopted by the court (Doc. 35) and facts taken from trial.

1. Farnsworth is an adult resident of Peck, Kansas, which lies within the boundaries of Unified School District No. 263.

2. Mulvane is a municipality organized and existing under the laws of the State of Kansas. James Ford is the Mayor of Mulvane.

3. Mulvane is governed by duly elected members of a city council.

4. Mulvane regularly holds city council meetings (both regular meetings and special meetings).

---

[1]At trial, Farnsworth testified that she is not requesting a specific dollar amount and will leave it up to the court to determine what is just.

5. When in attendance, Mayor Ford presides over meetings of the city council.  Mayor Ford has authority to set rules, determine who may speak, and determine who is out of order.  The city council as a whole has authority to overrule Mayor Ford if it decides it wants to hear a certain topic or speaker.

6. The citizens of Sumner County, Kansas, through an election, voted to allow the construction of a state-approved casino in Sumner County. Mulvane, in part, is located in Sumner County.

7. Mayor Ford believed that a casino being placed around Kansas Turnpike (Interstate 35) exit 33 "had the opportunity to provide the Mulvane the capability to significantly improve its infrastructure and its services without it being a burden on [its citizens]."

8. Farnsworth viewed the casino as a potential drain on the local economy.

9. On January 14, 2008, three members of the city council issued to Mayor Ford a written request for a special meeting to be held at the Mulvane High School Auditorium on January 16. The purposes of the meeting were to be as follows:

- Entertaining a Presentation from Sumner County Gaming Joint Venture, L.c. ("Harrah's") requesting the endorsement of the Council for a Lottery Gaming Facility proposed to be located in the City of Mulvane, Kansas;

- Hearing public comment and questions on the issue of such an endorsement; and

- Discussing, considering and acting upon (if appropriate) a Resolution of Endorsement of Said Lottery Gaming Facility, to include any and all matters ancillary or related thereto without limitation.

10. The written request for the special meeting included a request that "the Mayor conduct the public comment session of said

-3-

meeting in a manner he deems appropriate to maintain the dignified nature, decorum and safety of all persons attending," and offered the following suggested guidelines:

- Speakers to be residents of United School District No. 263;

- Speakers have attained the age of majority;

- Speakers sign up to speak at City Hall in advance;

- Speakers be limited to three (3) minutes each;

- Questions and the dialogue with Harrah's and the Council members be accepted (within the time constraints for speakers);

- Public comment period to be limited to approximately two hours;

- Speaker content be limited to matters related to the request for endorsement.

11. Mulvane planned a time for the public to be able to direct questions to the Harrah's presenter before the city council voted whether to endorse the proposal.  The Harrah's section was not intended to provide for indiscriminate speech by the public. It was intended to be more restrictive and focused than the hours-long public comment section which was to follow immediately.

12. In order to be able to focus attention purely on the specifics of the presentation to be made by Harrah's, Mulvane established a set of rules, both for the meeting in general and specifically for the Harrah's section of the meeting.  Mulvane determined that an open referendum on gambling and social ills during the questions section of the Harrah's presentation would not be relevant to the specific matter under consideration at that time, that being whether Mulvane should issue an endorsement (under the provisions of the Expanded Lottery Gaming Act) of the Harrah's

proposal.   These guidelines were as follows:

RULES FOR SPEAKING

1.   FIRST -State Your NAME and ADDRESS.
2.   Speakers must have previously signed the speaker
     list in advance.
3.   Speakers must be a resident of Unified School
     District No. 263
4.   Speakers must be an adult having reached the age
     of majority.
5.   All  comments  will  be  limited  to  three  (3)
     minutes per person.
6.   Questions concerning the Harrah's proposal will
     be entertained.
7.   Questions or comments on matters other than the
     Lottery Gaming Proposal Endorsement will not be
     allowed.
8.   The  comment  period  will  be  limited  to
     approximately 2 hours.

13. The city council understood that casino policies dealing with irresponsible gambling would be dealt with and approved by the State under the Expanded Lottery Gaming Act.

14. Prior to the meeting, the city council had information that thousands of people might either attend or be in Mulvane at the time of the meeting. Emotions surrounding the casino issue on all sides were high, and it was very important to Mulvane that the meeting be conducted in as civil, orderly and efficient manner as possible.  All of the officers of Mulvane's police force, about a dozen, were present at the meeting.

15. The agenda for the January 16 meeting provided as follows:

Call Special Meeting to Order
Reading of the Special Meeting Notice
Pledge of Allegiance & Invocation
Roll Call

OLD BUSINESS

•   Presentation by Harrah's (Approx. 60 min.)
•   Questions from the General Public (Approx. 30 min.)

- Comments from Registered Speakers (Approx. 2 hrs.)
- Council discussion/action on casino endorsement

ADJOURNMENT

16. Mulvane announced and displayed its established rules at the beginning of the meeting.

17. Farnsworth signed up in advance to make a public comment during the January 16 meeting. Farnsworth was aware that the content of any speech at Harrah's section would be limited to the matters relating to the request for endorsement of Harrah's proposal for the establishment of a lottery gaming facility in Mulvane.

18. During the Harrah's section of the January 16 meeting, Harrah's presenter talked about how the proposal would boost the local economy, its commitment to address irresponsible gambling, and its commitment to making Mulvane a vibrant place to work and live.

19. Prior to the section set aside for questions directed to Harrah's representative, Mayor Ford made statements generally as follows:

- This is not a referendum or open forum on gambling and social ills. Any attempt to present it as such will be considered out of order and terminated.

- Any of these actions will result in your being removed from the meeting.

- Restrict your questions to the presentation or the manner in which [Mulvane] will be expected to be involved.

- Questions addressing other subjects, for example annexation or zoning, are out of order and not responded to.

- Questions will be restricted to the presentation and or how [Mulvane] will handle or address any portions of the presentation.

20. Toward the end of the thirty-minute Harrah's section reserved for questions, the Mayor announced that the thirty minutes

-6-

had elapsed and that he would allow two more questions. The second to

the last person to approach the microphone following that announcement

was Farnsworth.   The following exchange occurred between Farnsworth

(JF) and Mayor Ford (MF):

> JF: My concern is also ...

> MF: Name please. Name and address.

> JF: My name is Jacque Farnsworth. 1407 Fortner Drive, Fortner Road, excuse me. My concern is also for the 50% of the -uh -the money that will be taken out of our local economy, money that would be normally used for clothing and entertainment on the local businesses, if ...

> MF: I don't believe your asking a question addressing the presentation by Harrah's.

> JF: Yes.

> MF: That's more on social ills, I said they would not be addressed,

> JF: No, no, no. No. I am asking my questions, I just wanted them to understand my background. OK. My, my question is, that, I want to know if you are going to be taking this money and making this money from people who here, then where is the money going to come from for the people who are normally spending it on the local economy through clothing and ...

> MF: Your question is out of order.

> JF: Can you explain why the question is out of order?

> MF: It is out of order.

> JF: Can you tell me why it is out of order?

> MF: I specifically said that we would address questions to, concerning the casino or the resort development and its facilities and how [Mulvane] would handle it or address that. You are addressing a social issue over which they have no control. So your question is out of order.

> JF: No. My question is regarding the casino itself and it having the impact on our economy.

> MF: Your question is out of order.

-7-

JF: No. You know what, everybody else ...

MF: Excuse me, would you please escort the lady out?

JF: No, excuse me, everybody else (officers escorted her out)

21. No member of the city council objected to or commented about Mayor Ford's actions, even though they had a right to do so.

22. Mayor Ford was exercising a discretionary function in presiding over the January 16 meeting and in enforcing the rules and procedures established for that meeting. During Farnsworth's appearance in the Harrah's section of the meeting, Mayor Ford concluded that the statements made by Farnsworth were not in compliance with the rules and regulations established in advance for that meeting.

23. Although Farnsworth initially signed up to speak during the public comment section, she decided to speak during the Harrah's section in part because she did not believe that a question posed by an earlier resident, Karen DeGraff, had been answered. Farnsworth was aware of Mayor Ford's restrictions. She wanted to preface her question which was intended to be how Harrah's intended to accomplish its objectives in light of the fact that if people spent money at the casinos, they could not spend that same money at local businesses. Farnsworth did not intend to violate Mayor Ford's restrictions and she now can understand how Ford "could have seen where she was going."

24. Mulvane's police officers who escorted Farnsworth out of the meeting were courteous to her, and she has no complaint about their conduct.

25. The print and television media publicized Farnsworth being

-8-

escorted out by Mulvane's officers.  Farnsworth feels embarrassed and ashamed because of some people's negative reactions when they recognize her.  Nevertheless, she does not mind being a spokesperson against the casino and has been permitted to express her views at other public events, e.g. the Kansas Lottery Gaming Facility Review Board and the Mulvane City Planning Commission and Board of Zoning Appeals.

26.  Shawn Townson is a member of the city council who was present at the January 16 meeting.  Townson has both moral and religious objections to construction of the casino.  As a result of what occurred to Farnsworth, Townson's opinion of her has increased. Townson was a credible witness.

27. Karen DeGraff testified that she is a friend of Farnsworth. They attend the same church.  DeGraff spoke during the Harrah's section and was present when Farnsworth was escorted out.  Since the meeting, she has heard an unidentified woman comment about a "lady who was drug off at the meeting" and has seen another unidentified woman "make a face" and ask "is that the lady who was hauled off?"  DeGraff now perceives Farnsworth as the "irrational voice" of the anti-casino faction.  DeGraff was not a particularly credible witness.

28. During the public comment section of the January 16 meeting, numerous citizens were recognized by Mayor Ford and allowed to give speeches, without interruption or restriction, expressing opinions and views in opposition to casinos in general and in opposition to the location and establishment of a casino in Mulvane.

29. There were opportunities other than the January 16 meeting at which persons could express their views and opinions regarding the

location and establishment of a casino in Mulvane or in Sumner County. The January 16 meeting, however, was the only meeting where Harrah's was making a presentation to Mulvane seeking its endorsement and was the only meeting going on that night concerning the establishment of a casino in Mulvane.

## III.   ANALYSIS

### 1) Section 1983

"Under 42 U.S.C. § 1983, [Farnsworth] must establish '(1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a 'person' (4) who acted under color of any statute, ordinance, regulation, custom[,] or usage, of any State or Territory or the District of Columbia.'" Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002) (citing 1A Martin A. Schwartz, Section 1983 Litigation: Claims and Defenses § 1.4, at 12 (3d ed.1997). Farnsworth bears the burden of (1) coming forward with sufficient facts to show that Mulvane's policy violated her constitutional rights and (2) to demonstrate that her rights allegedly violated were "clearly established" at the time the conduct occurred. Pearson v. Callahan, 129 S. Ct. 808, 815, 2009 WL 128768, at *6 (U.S. Jan. 21, 2009).

Farnsworth claims that Mulvane violated her constitutional rights to free speech, equal protection, and due process when it "prohibited her from asking her question based on its viewpoint and content." (Doc. 21 at 2). Mulvane disputes that any constitutional violation occurred, but concedes that the procedure it implemented during the meeting was official policy as contemplated under 42 U.S.C. § 1983.

-10-

**2) First Amendment**

A three-step framework is utilized when determining whether restrictions on speech are constitutional. <u>Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.</u>, 473 U.S. 788 (1985); <u>Wells v. City and County of Denver</u>, 257 F.3d 1132, 1138-9 (10th Cir. 2001). First, is the speech at issue protected by the First Amendment? <u>Wells</u>, 257 F.3d at 1138. Second, if so, is the nature of the forum public, limited public, or nonpublic? <u>Id.</u> at 1138-9. Third, do "'the justifications for exclusion from the relevant forum satisfy the requisite standard,' e.g., whether a content-based restriction can survive strict scrutiny, whether a content-neutral restriction is a valid regulation of the time, place, or manner of speech, or whether a restriction in a nonpublic forum is reasonable." <u>Id.</u> "Viewpoint-based restrictions receive even more critical judicial treatment." <u>Mesa v. White</u>, 197 F.3d 1041, 1047 (10th Cir. 1999). The question of whether an individual's right to free speech was violated depends on the facts of the specific case.

The first step is not in dispute. Clearly, questions and/or comments from Farnsworth regarding the construction of a casino in her community are protected speech under the Constitution.

Turning to the second step, a governmental entity may create a "designated public forum" when it intentionally allows public discourse in a nonpublic forum. <u>Wells</u>, 257 F.3d at 1145. "Designated public fora differ from traditional public fora in that 'a State is not required to indefinitely retain the open character of the facility ....'" <u>Id.</u> Courts consider the purpose and extent of use of the forum and the government's intent for opening the nonpublic forum for public

discourse.   <u>Summum v. Callaghan</u>, 130 F.3d 906, 915 (10th Cir. 1997).

> "Government restrictions on speech in a designated public forum are subject to the same strict scrutiny as restrictions in a traditional public forum[,]" i.e. content-based restrictions "must be narrowly tailored to serve a compelling government interest", reasonable time, place, and manner restrictions are allowed on content-neutral speech so long as they are "narrowly tailored to serve a significant governmental interest and leave open ample alternative channels of communication," and viewpoint-based restrictions are prohibited[.]

<u>Pleasant Grove City, Utah v. Summum</u>, 129 S. Ct. 1125, 1132, 172 L. Ed. 2d 853 (2009) (citations omitted).

A governmental entity may also create a "limited public forum" when it allows selective access to some speakers for the purpose of discussion on a particular subject-matter.[2]   <u>Shero v. City of Grove,</u>

---

[2]In <u>Summum</u>, the Tenth Circuit explained:

Sometimes included within this category of designated public forum is property referred to as a "limited public forum." In <u>Widmar v. Vincent</u>, 454 U.S. 263, 102 S. Ct. 269, 70 L. Ed. 2d 440 (1981), for example, the Supreme Court held that a state university had created a "limited public forum," <u>id.</u> at 272, 102 S. Ct. at 275-76, by making its facilities generally available for the activities of registered student groups, and applied the strict scrutiny test to the university's decision to exclude a religious student group from using its facilities, <u>id.</u> at 269-70, 102 S. Ct. at 274-75. Thus, in <u>Widmar</u>, the term "limited public forum" was used specifically to denote a particular sub-category of the designated public forum—a designated public forum for a limited purpose for use by certain speakers, i.e., registered student groups.

In more recent cases, however, the Court has used the term "limited public forum" to describe a type of nonpublic forum and has applied a reasonableness standard under which the state may restrict speech "so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." <u>Cornelius</u>, 473 U.S. at 806, 105 S. Ct. at 3451.

<u>Summum</u>, 130 F.3d at 914-15.

Okl., 510 F.3d 1196, 1202 (10th Cir. 2007).  Both the Supreme Court and the Tenth Circuit have applied nonpublic fora standards to "limited public fora" such that restrictions on speech must be reasonable and viewpoint-neutral.  See, e.g., Pleasant Grove City, 129 S. Ct. at 1132; Summum, 130 F.3d at 914-15.

The third step has two parts.  A court's first inquiry is whether the speech restriction is viewpoint and/or content-based or is it content-neutral.[3]  Mesa, 197 F.3d at 1045.

> The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. (Citations omitted). The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others. (Citations omitted). Government regulation of expressive activity is content neutral so long as it is "justified without reference to the content of the regulated speech."

Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).  "When a restriction on speech is 'aimed not at the content' of the speech but at the 'secondary effects' generated by or associated with the speech,

---

[3]In Mesa, the Tenth Circuit explained:

> A content-based regulation either explicitly or implicitly presumes to regulate speech on the basis of the substance of the message. A viewpoint-based law goes beyond mere content-based discrimination and regulates speech based upon agreement or disagreement with the particular position the speaker wishes to express. Viewpoint discrimination is a subset of content discrimination; all viewpoint discrimination is first content discrimination, but not all content discrimination is viewpoint discrimination.

197 F.3d at 1046 (citing 1 Rodney A. Smolla, Smolla and Nimmer on Freedom of Speech § 3:9 (1998)).

the restriction is considered to be content-neutral." <u>See</u>, <u>e.g.</u>, <u>Zapach v. Dismuke</u>, 134 F. Supp. 2d 682, 690 (E.D. Pa. 2001) (quoting <u>City of Renton v. Playtime Theatres, Inc.</u>, 475 U.S. 41, 47 (1986)). The court's second inquiry is to examine the defendant's justifications and determine whether the restriction satisfies the requisite standard of scrutiny. <u>Ward</u>, 491 U.S. at 791.

     The parties agree that Mulvane created, at the very least, a "limited public forum." (Doc. 21 at 1). The facts of this case appear to be unique in that restrictions were placed on speech during the Harrah's section of the meeting, but no restrictions applied to the public section which immediately followed. At trial, the court inquired of counsel whether they were aware of any authority discussing this type of "hybrid forum," for lack of a better term. They were not and the court has been unable to discover any authority in its own research. The "hybrid forum," to some extent, has complicated application of the case law definitions and distinctions of designated public fora, designated public fora for a limited purpose, and limited (non-public) fora, each of which is discussed in <u>Summum</u>, 130 F.3d at 914-15. As the Tenth Circuit notes in <u>Summum</u>, there is confusion regarding the types of fora caused by the Supreme Court's inconsistent use of the term "limited public forum." The Tenth Circuit still was experiencing some definitional problems in <u>Shero v. City of Grove, Okl.</u>, 510 F.3d 1196, 1202-03 (10th Cir. 2007). Neither party contends that the city council meeting was a traditional public forum. In the end, it really makes no difference whether the meeting was designated or limited but the court has tried to recognize the three-step process nonetheless.

Farnsworth contends that Mulvane restricted speech based on viewpoint, which is unconstitutional in either a "designated public forum" or "limited public forum." Mulvane takes the position that whatever the type of forum, its restriction during the Harrah's section was content neutral and reasonable and did not violate Farnsworth's rights. (Doc. 19 at 18).

### Mulvane's Restriction

Mulvane restricted speech concerning gambling and "social ills" during the Harrah's section of the meeting. Mulvane's policy did not prohibit speech pertaining to the social benefits of gambling. Mayor Ford expressly stated at the outset of the Harrah's section that "[t]his is not a referendum or open forum on gambling and social ills. Any attempt to present it as such will be considered out of order and terminated." (Doc. 21 at 5). Additionally, Mayor Ford testified in his deposition that he had a right to prevent a person from speaking based on viewpoint if the speaker "divulge[d] [sic] from the specific purpose of the meeting" and furthermore, could enforce Mulvane's policy against questions and/or comments pertaining to the "social ills" of gambling. (Doc. 20-3 at 55). Mayor Ford further believed that questions or comments on the "social ills" of gambling could not be relevant to Harrah's presentation. Farnsworth contends that these statements coupled with the fact that Mayor Ford is responsible for creating the official policy governing city council meetings constitutes viewpoint-based speech restrictions.

Mulvane responds that its policy was viewpoint neutral because the motivating factors behind Mulvane's restriction did not focus on the speaker's point of view, but rather that the restriction was

intended to maintain order.

The court agrees with Farnsworth that the restriction was viewpoint-based. But even if the restriction was content neutral, the court concludes that it cannot survive the requisite standard of scrutiny.

<u>Mulvane's Justification</u>

The court agrees that Mulvane was justifiably concerned about safety and maintaining order within the meeting.[4] The evidence shows that the proposal of building a casino in Mulvane was a highly controversial issue within the community. There were strong advocates on both sides who were expected to be present at the January 16 meeting. Mulvane's entire police force was present. Mulvane's restriction would have passed Constitutional muster (i.e. would have been both viewpoint and content neutral) if it had simply precluded the "social benefits" as well as the "social ills" of gambling and/or if Mayor Ford had enforced the restriction as announced. In other words, at least in theory, a restriction could have been imposed and enforced which could have passed strict scrutiny, i.e. narrowly-enough tailored to serve the compelling government interest of good order at the meeting. Or Mayor Ford could have told Farnsworth to save her comments for the public session.

But that is not what happened. Mayor Ford allowed both

---

[4]The parties stipulated that "[Mulvane] has a right to take reasonable steps, in line with the Constitution, to prevent disruption of the orderly and efficient conduct of its meetings. [Mulvane] has an interest in conserving time and ensuring that others have an opportunity to speak at a public meeting." (Doc. 35 at 3).
    Unlike some of the cases cited by the parties, e.g. <u>Jones v. Heyman</u>, 888 F.2d 1328 (11th Cir. 1989), Farnsworth did not disrupt the meeting or interfere with its orderly conduct.

questions and answers that violated his own restriction.  Harrah's presenter discussed matters that concerned gambling and "social ills" such as irresponsible gambling.  For example, Dusty Taveress asked question nine:

> Mr. Atwood, you had discussed a code of conduct that your company has which is a very important part of your company, and in that code of conduct you did discuss about if a guest is gambling irresponsibly -2 part question.  How do you know they are gambling irresponsibly, and how do you regulate that? I mean, that is human nature -it is so hard.

> Answer: (Harrah's Rep.) This is an area where we have spent a great deal of effort, because this is important for us. So, uh, we do not do the research ourselves, we actually hire qualified professionals. The Center for Responsible Gaming Studies is actually in Kansas City, Missouri. And it is something that we and other companies in our industries help to fund. But we do not directly do the research. So there is an enormous amount of research on this topic, that is under _____ today. Our company received the award in the late 1980s from the National Center for Responsible Gaming, the first time that an organization had ever given anybody in the industry an award -they gave the award to us because of all the work we do. So we are clearly not trained professionals to deal with customers, but we do have certain conduct rules. So if a customer tells us that they are having a problem gambling, or that they think they are gambling too much, we have ambassadors on site who are able to speak with them. We have a voluntary program where a customer can exclude themselves from playing in the casino. When they do that with us, we set them up all across the country so that they don't play with us anywhere. We are the only people who are able to do that, but we do it nevertheless. There are sometimes when we -and not very often -I have to say, because there are other, there are three or four of us who are on a committee in the company where others can appeal to us to have someone excluded. This is a very delicate thing, as you might imagine, because it is something that someone has chosen to do. What they think about it and what someone else might think about it are different things. But we do go to a lot of trouble to do it. I will say it is important for us to work hard at it, and while we are not qualified professionals we fund all of the other people who are, and expect they will be able to take care of people. But if you have seen our advertising, you will also see in all of our advertising that we are

> advertising to people that if you have a gambling problem
> this is who you should contact. And also, as I mentioned
> to people, we actually run advertising on TV to encourage
> people if they have gambling problems, not just from us,
> but from other forms of gambling, lottery and others,
> that they should seek professional assistance. Thank you.

(Doc. 35 at 19).

Mayor Ford did not cut off Ms. Taveress or Harrah's presenter even though the question and answer discussed matters touching on gambling and "social ills". "[W]here the government states that it rejects something because of a certain characteristic, but other things possessing the same characteristic are accepted, this sort of underinclusiveness raises a suspicion that the stated neutral ground for action is meant to shield an impermissible motive." Ridley v. Massachusetts Bay Transp. Authority, 390 F.3d 65, 87 (1st Cir. 2004).

Furthermore, at the point Farnsworth was cut off from speaking, Mayor Ford could not have objectively determined that her question would be unrelated to Harrah's presentation. Farnsworth intended to preface her question with statements to provide context for her question. Mayor Ford did not cut her off because she was not asking a question. Mayor Ford undoubtedly assumed that Farnsworth's question would be about gambling and "social ills" because he knew where she stood on the issue of building a casino. City council members "had heard and were aware of the social ill argument that members of the community might spend money at the casino that would be better spent on food and clothing." (Doc. 35 at 12). Consequently, Mayor Ford ruled Farnsworth's question to be out of order before she even asked it. Instead of asking Farnsworth to wait a few minutes until the comment section to ask her question, Mayor Ford had her escorted out

of the meeting by police.  As a result, Farnsworth was unable to ask
her question or share her comments at any part of the January 16
meeting.  "The government must abstain from regulating speech when the
motivating ideology or the opinion or perspective of the speaker is
the rationale for the restriction." <u>Rosenberger v. Rector and Visitors
of University of Virginia</u>, 515 U.S. 819, 829 (1995).  Therefore,
Mulvane's justification for prohibiting Farnsworth's speech was
unreasonable and Farnsworth's First Amendment right was violated.

<u>Mulvane's Liability</u>

At trial, Mulvane appeared to make the argument that it cannot
be held liable for Mayor Ford's actions under the theory of respondeat
superior.  "Under Section 1983, municipalities cannot be held liable
for the actions of others under the common law principle of respondeat
superior[.]" <u>Simmons v. Uintah Health Care Special Dist.</u>, 506 F.3d
1281, 1284 (10th Cir. 2007).

The parties stipulated that Mayor Ford's rules were official
Mulvane policy.  Mulvane's police officers followed Mayor Ford's
orders and escorted Farnsworth out of the meeting.  Mayor Ford was
following official Mulvane policy, i.e. official policy he
established, when he violated Farnsworth's First Amendment right.
Mulvane is liable for his actions.  <u>Id.</u> ("When employees take actions
specifically authorized by policy or custom, their actions can be
fairly said to be the municipality's.").  Furthermore, Mulvane
ratified Mayor Ford's decision to cut off and remove Farnsworth when
members of the city council did not question or overrule his decision.
<u>Moss v. Kopp</u>, 559 F.3d 1155, 1169 (10th Cir. 2009) (stating that "if
a subordinate's position is subject to review by the municipality's

authorized policymakers and the authorized policymakers approve a subordinate's decision and the basis for it, their ratification will be chargeable to the municipality[]").

### 3) **Farnsworth's Other Claims**

Farnsworth claims that Mulvane treated her unequally because of her viewpoint on constructing the casino in violation of the Equal Protection Clause of the Fourteenth Amendment.  She further claims that Mulvane violated her Due Process right by failing to provide proper notice of its alleged viewpoint and content-based restrictions and by giving Mayor Ford "unbridled discretion" in determining what questions and/or comments were unrelated to Harrah's presentation. Because the court finds that Mulvane violated Farnsworth's First Amendment right to free speech, it need not consider Farnsworth's Equal Protection and Due Process claims.

## IV.   CONCLUSIONS OF LAW

The court concludes that Mulvane violated Farnsworth's First Amendment right to free speech.

## V.   DECLARATORY RELIEF

The court declares that Mulvane's policies and actions in this case were unconstitutional.

## VI.   OTHER RELIEF

Compensatory damages are available in § 1983 claims "to compensate persons for injuries that are caused by the deprivation of constitutional rights." Memphis Community School Dist. v. Stachura, 477 U.S. 299, 307 (1986).  Injuries include humiliation, mental anguish, and impairment of reputation.  Id.  Before a court can award compensatory damages, the plaintiff must prove an actual injury as a

-20-

result of the constitutional violation.  Id. at 308 (stating that "no compensatory damages could be awarded for violation of that right absent proof of actual injury").

Farnsworth did not brief the issue of damages for humiliation and loss or reputation nor did she request a specific dollar amount. Farnsworth testified at trial that she felt that the city council and Mayor Ford trampled on her rights and had done a disservice in embarrassing her and making her feel that she is less than what she is.  She further testified that she is against the casino and does not mind being known for that, but she feels like she is now deemed the leader and did not want to be portrayed in that light.

The court finds that Farnsworth did not prove any actual injury. Farnsworth continued going to city and state meetings where she spoke out in opposition to the casino.  The court heard evidence that Farnsworth's reputation was damaged in some people's views but improved in others' views.  "[T]he abstract value of a constitutional right may not form the basis for § 1983 damages."  Id.  Therefore, the court does not award compensatory damages because plaintiff has proven only a constitutional violation.

Because the court finds that Mulvane violated Farnsworth's First Amendment right, it awards Farnsworth nominal damages of $1.00. Lippoldt v. Cole, 468 F.3d 1204, 1221 (10th Cir. 2006).

Farnsworth also requests an award of attorney fees under 42 U.S.C. § 1988.  "In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, ... of this title, ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, ...."

42 U.S.C. § 1988(b). The court finds that Farnsworth is entitled to attorney's fees and costs.

The parties are given until September 30, 2009, to agree on the amount of attorney's fees and costs. If no agreement can be reached, the court will schedule a hearing to resolve the question, after which the court will direct the clerk to enter judgment in accordance with this decision.

A motion for reconsideration of this order pursuant to this court's Rule 7.3 is not encouraged. The standards governing motions to reconsider are well established. A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence. Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate. Comeau v. Rupp, 810 F. Supp. 1172 (D. Kan. 1992). Any such motion shall not exceed five pages and shall strictly comply with the standards enunciated by this court in Comeau v. Rupp. The response to any motion for reconsideration shall not exceed three pages. No reply shall be filed.

IT IS SO ORDERED.

Dated this  16th  day of September 2009, at Wichita, Kansas.

                              s/ Monti Belot
                              Monti L. Belot
                              UNITED STATES DISTRICT JUDGE

-22-